UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JONATHAN CLARKE and RODRIGO
FERREIRA DA CRUZ VOGT, on behalf of
themselves and all others similarly situated,

      Plaintiffs,

      v.

BENJAMIN CHOW, METEORA, HAYDEN
DAVIS, GIDEON DAVIS, CHARLES
THOMAS DAVIS, and KELSIER LABS,
LLC d/b/a KELSIER VENTURES,

Defendants.

Case No.:

JURY TRIAL DEMANDED

**CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.    INTRODUCTION.................................................................................................. 1

II.   PARTIES............................................................................................................. 4

      A.   Plaintiffs .................................................................................................. 4

      B.   Defendants ............................................................................................... 5

III.  JURISDICTION AND VENUE ......................................................................... 6

IV.   BACKGROUND CONCEPTS .......................................................................... 7

      A.   Blockchain................................................................................................ 7

      B.   Decentralized Exchanges ........................................................................ 9

      C.   Memecoins ............................................................................................. 10

V.    DEFENDANTS JOINTLY DEVELOP A PLAN TO DEFRAUD INVESTORS BY
      OFFERING A NEW SECURITY ON METEORA, THE $M3M3 TOKEN .................... 11

VI.   DEFENDANTS MARKET THE $M3M3 TOKEN AS A SUPERIOR "MEMECOIN"
      INVESTMENT WITH COMPARATIVELY LOW RISK ................................. 13

VII.  DEFENDANTS EXECUTE THEIR SCHEME CAUSING TENS OF MILLIONS  IN
      LOSSES TO NON-INSIDER $M3M3 INVESTORS ........................................ 24

VIII. DEFENDANTS ARE PUBLICLY ACCUSED OF FRAUD........................... 28

IX.   $M3M3 TOKENS ARE SECURITIES ............................................................. 29

X.    CLASS ACTION ALLEGATIONS ................................................................. 31

      A.   Numerosity ............................................................................................. 31

      B.   Typicality ............................................................................................... 31

      C.   Adequacy................................................................................................ 31

      D.   Prominence and Superiority ................................................................... 32

XI.   CAUSES OF ACTION ..................................................................................... 33

XII.  PRAYER FOR RELIEF .................................................................................... 42

XIII. JURY DEMAND ............................................................................................... 43

Plaintiffs Jonathan Clarke and Rodrigo Ferreira Da Cruz Vogt, individually and on behalf of all others similarly situated, bring this class action lawsuit against Defendants Benjamin Chow, Hayden Davis, Gideon Davis, and Charles Thomas Davis (collectively, the "Individual Defendants"), Kelsier Labs LLC d/b/a Kelsier Ventures ("Kelsier") and Meteora, an unincorporated decentralized crypto asset exchange.  Plaintiffs' allegations are based on personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiffs' undersigned counsel, which included, without limitation:  review and analysis of press releases, news articles, websites, state corporate filings, and other publicly available information concerning Defendants and the cryptocurrency known as $M3M3 ("$M3M3" or the "$M3M3 Token").

## I.     INTRODUCTION

1.      On December 4, 2024, Defendants purported to introduce a solution to the excessive risk, price volatility, and misconduct that plagued memecoin investing.

2.      One, Defendant Meteora—a prominent decentralized crypto asset exchange built on the Solana blockchain—announced a new, purportedly revolutionary, investment platform, called "M3M3."   Defendant Chow—Meteora's then highly respected CEO—explained that investors that "staked" (or locked) digital assets on M3M3 would receive certain rewards, including a portion of transaction fees generated on Meteora.  Investors would thus be incentivized to stake memecoin assets instead of selling them and, because Meteora transaction fees flowed only to "top stakers," the M3M3 Platform would further incentivize a communally beneficial competition among investors to stake in large quantities.  As a result, said Defendants Meteora and Chow, M3M3 would materially reduce price volatility, increase overall market capitalization, and protect investors in every digital asset that participated in M3M3 from pump-and-dump schemes and sharp drops in market price shortly after that asset's launch.

3.     Two, in tandem with the M3M3 Platform, Defendants purported to publicly offer a new digital asset, $M3M3, by "launching" it on Meteora.  Publicly, $M3M3 was presented as a Meteora project.  In reality, $M3M3—that is, its launch, offering, promotion, and sales to Plaintiffs and hundreds of other investors—was a collaboration between Meteora and Chow, on the one hand, and Defendant Kelser, a venture capital firm run by the Davis Defendants (a father and two sons).  Defendants deliberately concealed their involvement.

4.     Defendants aggressively marketed $M3M3 as an innovative and singularly low-risk digital asset investment, closely tied with the M3M3 Platform and Meteora.  Their promotional campaign emphasized four purported distinctions between $M3M3 and other memecoins: (i) its status as the "debut" asset on Meteora's revolutionary investor-friendly Platform; (ii) investors' ongoing entitlement to revenue generated on Meteora; (iii) the central involvement of Defendant Chow, a highly-respected and trusted leader in the Solana ecosystem, and his seeming exclusive responsibility for the project; (iv) the Tokens' launch on Meteora, a purportedly sophisticated, reliable. and transparent DEX.

5.     Thus, Defendants—directly and through paid promoter, influencers, and partners— publicly presented $M3M3 as a uniquely reliable memecoin investment offered by sophisticated and trusted leaders in the Solana ecosystem (Defendants Meteora and Chow), in connection with the launch of an innovative investment platform specifically designed to protect investors and offer stable returns, backed by trading fees generated on Meteora.

6.     In reality, $M3M3 was a blatant fraud jointly planned and perpetrated by Meteora, Kelsier, and the Individual Defendants.

7.     Together, Defendants covertly orchestrated the purportedly public launch of $M3M3 on Meteora to limit initial sales to Defendants and a tightly-controlled group of insiders

using 150 electronic wallets (the "Insider Wallets").  Defendants' goal was to covertly dominate $M3M3 token supply, artificially inflate its market value, and extract profit from unsuspecting investors.

8.      Immediately after launching the $M3M3 liquidity pool on Meteora, Defendants covertly "froze" it.  As a result, purchase transactions attempted by members of the public simply failed without explanation.

9.      Insider Wallets were different.  Working in concert with the "deployer wallet" (the electronic wallet through which Defendants controlled the $M3M3 launch pool), each Insider Wallet could instantaneously "thaw" and "refreeze" the launch pool.  Thus, $M3M3 purchase transactions could be—and were—executed by sandwiching each purchase between a "thaw" and "re-freeze," both jointly executed by the deployer wallet and the purchasing Insider Wallet.  As a result, within about 20 minutes after purported public launch of $M3M3, insiders—including Defendants—secretly controlled over 95% of its 1 billion token supply.

10.     Defendants' plan succeeded: as a result of their covert and coordinated insider transactions, $M3M3 post-launch market capitalization was $5 million USD.  This artificially-inflated valuation communicated highly misleading information to non-insider investors, who reasonably relied on Defendants' representations that the $M3M3 launch was fully accessible to the public and conducted in a transparent manner fair to non-insider investors, and thus reasonably relied on $M3M3 market price as a meaningful measure of its value.  The post-launch price spike also served to corroborate Defendants' aggressively-marketed, but misleading, assertions that $M3M3 had intrinsic value and a comparatively low risk profile.

11.     Defendants and other insiders then began systematically selling $M3M3 Tokens to retail investors at the inflated prices they had deliberately manufactured.  The speed and scale of

those sales demonstrate intentional coordination. As a direct result, market price of $M3M3 tokens crashed sharply on December 6, 2024, causing the first in a sequence of significant losses borne be non-insider investors.

12. Thereafter, Defendants made strategic attempts to regain investor confidence, increase $M3M3 trading activity, and re-inflate its perceived value. Their efforts produced several short-lived upticks in market price, from which Defendants and their affiliates extracted additional profits, followed by sharp declines and investor losses. Defendants abandoned the M3M3 effort entirely in about late February. Since that time, $M3M3 Tokens have since traded at around $0.003.

13. As a direct result of Defendants' promotion and sale of $M3M3 between December 4, 2024, and the date of this filing, and Defendants' related misconduct, Plaintiffs and other members of the proposed Class suffered combined net losses of at least $69 million USD.

14. The federal securities laws are intended to warn investors of undisclosed risks and protect them from fraud. Had Defendants complied with the registration and disclosure requirements applicable to $M3M3, Plaintiffs and other non-insider investors would not have purchased $M3M3 Tokens at inflated prices or suffered the resulting losses. Defendants are liable to Plaintiffs and the rest of the proposed Class for compensatory and punitive damages, and other relief, to compensate for the substantial losses caused by Defendants' malfeasance.

## II. PARTIES

### A. Plaintiffs

15. Plaintiff Jonathan Clarke is an individual and a resident of Greer, South Carolina. Mr. Clarke invested in $M3M3 Tokens during the Class Period (as defined herein) and suffered a net loss of approximately $28.59 on those investments, as set forth in detail in his accompanying certification.

16.     Plaintiff Rodrigo Ferreira da Cruz Vogt is an individual and a resident of Brazil. Mr. Vogt invested in $M3M3 Tokens during the Class Period (as defined herein) and suffered a net loss of approximately $7,425.76 on those investments, as set forth in detail in his accompanying certification.

**B.     Defendants**

17.     Defendant Meteora is an unincorporated decentralized exchange operating on the Solana blockchain.  Throughout the relevant period, Meteora was operated and controlled from New York, NY by its co-founder and CEO, Defendant Benjamin Chow.

18.     Defendant Benjamin Chow is the co-founder of Meteora and its recent-former CEO.  Mr. Chow operated and controlled Meteora throughout the relevant period, from New York, NY, where he currently resides.  Likewise, on information and belief, Mr. Chow controlled and operated every

19.     Defendant Kelsier Labs LLC d/b/a Kelsier Ventures, is a family-run venture capital firm incorporated and headquartered in Texas.  Throughout the relevant period, Kelsier purported to specialize in Web3 investing, positioning itself as a catalyst for Web3 innovation that combined "go-to-market expertise" and "in-depth research" to offer "targeted investments" to help turn visionary projects "into a digital reality."

20.     Defendant Hayden Davis co-founded Kelsier and served as its CEO throughout the relevant period.  He is the brother and son, respectively, of Defendants Gideon Davis and Charles Thomas Davis. On information and belief, Hayden Davis resides in Texas.

21.     Defendant Gideon Davis co-founded Defendant Kelsier Ventures and served as its Chief Operating Officer ("COO") throughout the relevant period.  He is the brother and son, respectively, of Defendants Hayden Davis and Charles Thomas Davis. On information and belief, Gideon Davis resides in Texas.

22.    Defendant Charles Thomas Davis co-founded Defendant Kelsier Ventures and served as its chairman throughout the relevant period.  He is the father of Defendants Gideon and Hayden Davis.  On information and belief, Charles Thomas Davis resides in Texas.

## III.    JURISDICTION AND VENUE

23.    This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs assert claims under Sections 5, 12(a)(1), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77e, 77l(a)(1), 77o, and under Sections 10(b), and 20 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t. In addition, this Court has subject-matter jurisdiction over the Securities Act claims under Section 22 of that Act, 15 U.S.C. § 77v. This Court has subject-matter jurisdiction over the Exchange Act claims under Section 27 of that Act, 15 U.S.C. § 78aa(a), which provides that federal courts have exclusive jurisdiction over violations of the Exchange Act.

24.    This Court has subject-matter jurisdiction over the state law claims asserted in this action under 28 U.S.C. § 1367(a).

25.    Defendants Chow and Meteora are subject to this Court's general personal jurisdiction because they are located in New York, NY.

26.    For the purposes of claims asserted under the federal securities laws, every Defendant is subject to this Court's jurisdiction because they are located in the United States.

27.    In addition, this Court has specific personal jurisdiction over all Defendants because they purposefully availed themselves of the privilege of conducting activities in the United States and in New York in connection with the offer and sale of unregistered securities alleged herein, and with the related fraud and other misconduct also alleged herein.

28.    Venue lies in this District under 15 U.S.C. § 77v(a) because one or more Defendants is found or transacts business in this District and because offers and sales at issue in this action took place in this District.

IV.     **BACKGROUND CONCEPTS**

   **A. Blockchain**

29.     Blockchains are ledger systems that record transactions in a secure, transparent, and immutable manner.   Each "block" contains a cryptographic hash of the previous block, a timestamp, and transaction data, ensuring a continuous and verifiable record of activity.

30.     Blockchains are "decentralized," meaning that transactions are validated using multi-participant consensus mechanisms like "proof of work" (in which "miners" solve complex cryptographic puzzles to validate transactions) and "proof of stake" (in which "validators" propose and validate "blocks").

31.     Blockchains are also "distributed," meaning that they are shared across a network of independent computers (or "nodes"), each of which has a copy of the entire ledger (or a portion thereof, depending on the blockchain).

32.     Blockchain technology has a wide variety of applications. Most relevant here, blockchains are used to issue and transact in digital assets (or "crypto assets"), including digital currencies (or "cryptocurrencies").   Different blockchains record transactions of different types of crypto assets.

33.     To transact in crypto assets, investors use electronic "wallets," which are identified by unique alphanumeric strings (or "wallet addresses").   Thus, in general, transactions on public blockchains are publicly viewable, but only as transactions between alphanumeric wallet addresses.   The identities of the parties that own and control those wallets is generally not public.

34.     Crypto assets are typically designated by three- or four-letter symbols, like stocks. For example, Solana—the cryptocurrency "native" to the Solana blockchain—is denominated "SOL."   A single unit of a crypto asset is called a "token."

35.     The crypto asset transactions at issue in this lawsuit were recorded on Solana, a

"proof of stake" blockchain.  As in all "proof of stake" blockchains, validators are required to "stake"—that is, lock up, effectively as collateral—SOL.  Alternatively (or in addition), SOL investors can delegate their staked SOL to a validator.  Validators (and any delegators) earn rewards on their staked SOL in exchange for accurate work.  The Solana blockchain is "public," meaning that it operates on a permissionless basis and thus permits any user to join the network by staking SOL, validating transactions, and thus contributing to network security.

36.    The Solana Blockchain is operated, maintained, and managed by Solana Labs, Inc., a California corporation that maintains a "four story high tech" office space in lower Manhattan for Solana-based web3 companies to "demonstrate our commitment to fostering the crypto ecosystem in New York."[1]  Throughout the Class period, a significant portion of the operations, management, and technical development of the Solana blockchain was conducted in and controlled and directed from that office, which is located at 141 East Houston Street, New York NY.

37.    Transactions in Solana-based digital assets like $M3M3 are executed on the Solana blockchain.  As a technical matter, those transactions are completed when the "block" in which they are embedded is finalized on the Solana network.  That, in turn, requires an affirmative vote from a super-majority of stake-weighted validators, which is rooted through Solana's Tower-BFT consensus mechanism.  A significant proportion of Solana validators are located in the U.S.  An even larger proportion of the staked SOL that enables Solana validators belongs to U.S. investors.  More fundamentally, the Solana blockchain itself, including its Tower-BFT consensus mechanism

---

[1] https://www.prnewswire.com/news-releases/solana-labs-unveils-new-25-000-square-foot-4-story-community-office-space-in-lower-manhattan-301821800.html

to permanently validate "blocks" and the transactions embedded within them, is operated and maintained by Solana Labs, a California corporation with substantial operations in New York.

### B.    Decentralized Exchanges

38.    A decentralized exchange ("DEX") enables the exchange of crypto assets without any form of third-party oversight of users' trading activity. In contrast to centralized exchanges (like the New York Stock Exchange or centralized crypto asset exchanges such as Coinbase), DEXs do not require traders to transfer custody of their crypto assets to a central authority or a "trusted" third party in order to execute a trade. Instead, transactions are securely and publicly recorded on a blockchain.

39.    To facilitate asset exchanges between multiple parties, exchanges—whether centralized or decentralized—must have mechanisms to maintain asset liquidity and determine asset prices. A stock exchange, for example, implements this through an order book system, where buyers and sellers submit orders which specify the price and volume of an asset they would like to buy or sell. The trading price is determined by matching orders.

40.    Automated Market Makers ("AMMs") are a type of DEX that purport to solve those problems by maintaining pools of particular crypto assets and holding themselves open, on a continuing basis, as willing to facilitate trades in those assets. AMM's do not "match" buy and sell orders. Instead, in an AMM, trades are executed algorithmically by so-called "smart contracts." The code of the smart contract sets the applicable "rules" for AMM trades, like the methodologies to determine asset prices and trading fees.

41.    AMM's use "liquidity pools" containing crypto assets. For example, a standard two-sided liquidity pool will contain equal values of two different crypt assets (for example, $M3M3 and SOL). The price of each asset (in terms of the other asset) automatically adjusts based on supply and demand within the liquidity pool.

9

### C. Memecoins

42.     "Memecoins" are cryptocurrencies inspired by internet memes, jokes, or pop culture.  Unlike established cryptocurrencies such as Bitcoin (BTC), Ethereum (ETH), and SOL, which have clear use cases and established ecosystems, memecoins often emerge as viral sensations, gaining popularity through online communities, celebrity endorsements, and promotional campaigns.

43.     In the usual case, launching a new Solana memecoin -- that is, to make it available for sale to the public on a Solana-based capital formation protocol like Meteora -- requires a Solana-based "deployer wallet".  The deployer wallet is controlled by the "issuers." of the new asset, *i.e.*, the team that first makes it publicly available for sale to investors.  The deployer wallet is used to create a liquidity pool (or "launch pool") containing the new tokens, to "launch" that liquidity pool (*i.e.*, make it publicly available) and to control its operations thereafter.

44.     Generally, launching a new Solana memecoin—that is, making it available for sale on a Solana-based capital formation protocol like Meteora —requires a Solana-based "deployer wallet".  The deployer wallet is controlled by the team that makes the new memcoin publicly available for sale to investors.  The deployer wallet is used to create a liquidity pool containing the new asset (the "launch pool"), and to "launch" that pool, making the newly-minted tokens available for sales, and to control the operations of that liquidity pool (including sales transactions) thereafter.

45.     Some memecoins—including $M3M3, as alleged in greater detail below— purportedly have substantive utility or intrinsic value that is not based on investor enthusiasm.

46.     For "pure" memecoins—*i.e.*, the majority of memecoins, which do not purport to have utility or intrinsic value—prices are often highly volatile.  Memecoin value is heavily influenced by fluctuations in online sentiment, speculative trading, coordinated marketing efforts

and influencer campaigns, among other factors.  Memecoin investors frequently buy and sell large quantities of specific memecoins very rapidly, causing dramatic price swings.

47.    As described by Defendants Meteora and Chow on December 4, 2024, memecoin investing in late 2024 was "a race to dump," driven in part by investor fears of "creators selling allocation," sniping, and "insiders who bought in at highly advantageous prices." As a result, memecoin investors "don't see any value in holding for long and attempt to profit at the earliest opportunity after launch, causing a bleak trading chart and undermining potential growth."[2]

48.    On December 4, 2024, Defendants purported to offer a comprehensive solution to the problems in the memecoin investment market: the M3M3 Platform and the $M3M3 Token.

## V.    DEFENDANTS JOINTLY DEVELOP A PLAN TO DEFRAUD INVESTORS BY OFFERING A NEW SECURITY ON METEORA, THE $M3M3 TOKEN

49.    Defendant Meteora is a re-branded outgrowth from Mercurial Finance, a defunct company co-founded by Defendant Chow and "Meow," a well-known pseudonymous developer and entrepreneur in the Solana ecosystem.

50.    Throughout the relevant period—until his public resignation in February 2025—Defendant Chow operated and controlled Meteora in New York, New York.  His co-founder, Meow, operated Jupiter, one of the largest and most popular DEXs in the Solana ecosystem.  Meow had minimal operational involvement in Meteora during the Class Period.

51.    In or about November 2024, Defendants entered into an undisclosed partnership to collaborate on $M3M3, its launch on Meteora, and the compose $M3M3/M3M3 Platform

---

[2] https://medium.com/@meteoraag/introducing-m3m3-a-new-era-for-memecoin-hodling-a88a470d2adf.  "Sniping" refers to ultra-fast purchasing of new tokens as soon as they become available.

marketing and promotional campaign.  As part of that deal, Kelsier invested $2 million.

52.    Together, Defendants designed the $M3M3 Token and planned its launch on Meteora in a manner intended to illicitly enrich themselves at the expense of the unsuspecting investing public.

53.    Defendants Chow and Hayden Davis (the CEOs of Meteora and Kelsier, respectively) jointly designed and expressly agreed upon a plan to covertly dominate $M3M3 Token supply immediately after public launch and artificially inflate its market price.  The plan worked as follows:

54.    *First*, Defendants would place 900 million $M3M3 Tokens (90% of total supply) into a launch pool on Meteora.  The remaining 100 million Tokens (10% of total supply) would be publicly withheld and directly controlled by Defendants.

55.    *Second*, Defendant Kelsier would provide 42 SOL (worth about $5,826 USD at the time) to deposit into the $M3M3 launch pool.

56.    *Third*, using the deployer wallet, Defendants would "launch" the $M3M3 launch pool on Meteora and thus create the appearance that $M3M3 Tokens were generally available to the public.  Simultaneously, Defendants Meteora and Chow would publicly announce and promote $M3M3 and the M3M3 Platform and Defendants would begin execution of their pre-planned M3M3 promotional campaign.

57.    In reality, however, immediately upon $M3M3's purported "launch," the deployer wallet would surreptitiously freeze the entire launch pool.  During the "freeze," would-be investors seeking to purchase $M3M3 during the critical initial post-launch period were simply unable to successfully execute purchases from an ostensibly open liquidity pool, without knowing why.  Meanwhile, Defendants would surreptitiously acquire 85% of the token supply (and thus control a

total of 95%), leaving only 5% available for legitimate sales to the public.

58.    To do that, the deployer wallet and the Insider Wallets (the 150 electronic wallets controlled by Defendants and their close affiliates and agents) would work together to facilitate $M3M3 sales to insiders by "thawing" and "refreezing" the launch pool the instant before and after each sale, respectively.  Each "thaw" and "refreeze" was jointly executed by the deployer wallet and the Insider Wallet executing the illicit purchase.

59.    Defendants' express aim was to secretly preserve insider control over 95% of $M3M3, artificially inflate its market price, and then sell $M3M3 Tokens at artificially inflated prices to Plaintiffs and other unsuspecting investors, extracting significant profit at their expense.

60.    Thereafter, Defendants would execute a series of further "pump-and-dump" schemes, temporarily re-inflating token prices by announcing and promoting purported partnerships and investor rewards.

61.    Beginning on December 4, 2024, Defendants successfully executed their plan, as alleged in detail below.

## VI.    DEFENDANTS MARKET THE $M3M3 TOKEN AS A SUPERIOR "MEMECOIN" INVESTMENT WITH COMPARATIVELY LOW RISK

62.    Defendants jointly developed a coordinated promotional campaign for $M3M3 that intentionally misrepresented its material characteristics, including the identities of its issuers, the manner in which it was offered for sale, and the determinants of its post-launch market price.

63.    To execute that campaign, Defendants published content on multiple communication platforms using handles that were publicly identified as Defendant Meteora, Defendant Chow, or the "M3M3 Team" and dedicated channels that were publicly associated with Meteora or "M3M3."  On information and belief, each of those handles and channels were operated or controlled by Defendant Chow, including (but not limited to), by platform:

a.    X (formerly Twitter):

@MeteoraAG (https://x.com/MeteoraAG)
@WeAreM3M3_ (https://x.com/WEAREM3M3_\
@hellochow (https://x.com/hellochow -

b.    Medium.com:

Meteora (https://meteoraag.medium.com/

c.    Discord:

Meteora (https://discord.com/invite/meteora)

d.    Telegram:

M3M3 (https://web.telegram.org/k/#@M3M3ers)

e.    Websites:

Meteora (https://www.meteora.ag/)
M3M3 (https://wearem3m3.com/, no longer operational)

64.    In addition, Defendants amplified their $M3M3 marketing campaign through a series of high-profile influencers, promotions, and partnerships, funded by Kelsier and jointly directed by all Defendants.

65.    On December 4, 2024, Defendants simultaneously announced the M3M3 Platform, launched $M3M3, and began executing an intensive and coordinated promotional campaign for $M3M3.

66.    Their promotional campaign emphasized four purported distinctions between $M3M3 and other memecoins: (i) its status as the "debut" asset on Meteora's revolutionary investor-friendly Platform; (ii) investors' ongoing entitlement to revenue generated on Meteora; (iii) the central involvement of Defendant Chow, a highly-respected and trusted leader in the Solana ecosystem, and his seeming exclusive responsibility for the project; (iv) the Tokens' launch

14

on Meteora, a purportedly sophisticated, reliable. and transparent DEX.

67.     In so doing, Defendants' campaign consistently leveraged the legitimacy and trustworthiness conferred by Defendants Meteora and Chow, never disclosing the existence of their collaboration with Kelsier and the David Defendants, or the purposes of that partnership.

68.     Defendants made two major material misrepresentations about $M3M3 based on its purported differences from other memecoins.

69.     *One*, Defendants represented that $M3M3 would be offered to the public in a transparent, fair, and reliable "launch" conducted on Meteora (a then highly-respected DEX in the Solana ecosystem, known for its technological proficiency) and by Defendant Chow (a then highly-respected and trusted senior leader in the Solana ecosystem).  Defendants did not disclose their plan to extract profits from unsuspecting investors by manipulating the $M3M3 Token launch and market price.  Defendants also intentionally concealed the involvement of Kelsier and the Davis Defendants in $M3M3, their financial interests therein, and the central role they played in designing and executing its public promotion and sales.

*70.*     *Two*, Defendants represented $M3M3 as a superior investment because, in contrast to most memecoins, its value would be driven by legitimate factors, including (i) the purportedly sustainable revenue available by staking $M3M3 on the M3M3 Platform and receiving a portion of transaction fees earned on Meteora; (ii) the stabilizing influence of the M3M3 Platform on $M3M3 market value; and (iii) the skill and trustworthiness of the Meteora team purportedly (solely) responsible for M3M3.

71.     Thus, on December 4, 2024, Meteora officially introduced the "memecoin universe" to its new M3M3 Platform, a "new stake-to-earn mechanism where top memecoin stakers

compete to earn fee rewards from permanently-locked liquidity."[3]

72.     On X, @MeteoraAG posted a thread that began: "Introducing M3M3—pronounced 'Meme(3,3),'" a "new meta to transform memecoins from PvP to PPP."[4]  The thread described the memecoin investing *status quo* as dire:



73.     The M3M3 Platform was presented as a *solution* to these rampant "races to dump" and bad faith profit extractions.  Throughout their marketing campaign, Defendants repeatedly repeatedly asserted that the Platform was intended to, and would, shift memecoin investing from a "PvP" (or "Player vs. Player") dynamic to a virtuous cycle benefiting all investors:

---

[3] [Introducing M3M3: A New Era for Memecoin Hodling | by Meteora | Medium](https://...)

[4] [https://x.com/MeteoraAG/status/1864360366240879009](https://x.com/MeteoraAG/status/1864360366240879009)



74.     In particular, memecoin investors who "staked" (or locked) their tokens on M3M3 would be eligible to receive a portion of transaction fees generated on Meteora. That revenue stream would flow only to "top stakers," creating a beneficial competition among investors to hold and stake larger numbers of tokens. Defendants described this as the "M3M3 Flywheel" and claimed it would generate sustained upward pressure on token market value:



17

75.    In that same thread, Defendants announced the $M3M3 Token, claiming it was "created by @WEAREM3M3_ community members inspired by the M3M3 vision."  Of course, on information and belief, the "@WeAreM3M3_ community" comprised only Defendants and those working under their direction and control.  The announcement continued that $M3M3 would be used to "test the platform & bring together all who believe in the (3, 3 vision)"—namely the protected and stable memecoin investment experience Defendants purported to offer:



76.    Within hours of Meteora's M3M3 announcements, @WEAREM3M3_ posted on X that the revenue stream for $M3M3 stakers (*i.e.*, investors who purchased $M3M3 Tokens and then staked them on the M3M3 Platform) already exceeded $3 million:[5]

---

[5] https://x.com/WEAREM3M3_/status/1864383526683934800



77.    That type of post was typical.  Defendants repeatedly announced that large sums had already been collected for or distributed to $M3M3 investors—*e.g.*, "over $4.5 million in rewards," "more than $200,000 daily to the top stakers."

78.    Likewise, Defendants repeatedly asserted that the M3M3 staking mechanism would reduce rapid selling and prevent sudden price declines.  As a result, $M3M3 prices would hold their value, benefiting all investors.  Defendants pushed those messages especially aggressively on December 4 and 5, in conjunction with the $M3M3 launch and Defendants' opening price inflation campaign.  For example:



79.    By marketing $M3M3 Tokens as the "debut" memecoin on the M3M3 Platform, Defendants expressly and implicitly represented that Meteora and Chow would make sincere, good-faith and sophisticated efforts to ensure that $M3M3 showcased Platform's purported benefits for investors, *i.e.*, sustained and healthy market values, and a reliable revenue stream generated on Meteora.

80.    Throughout, Defendants promoted $M3M3 by associating it exclusively—and misleadingly—with Meteora, which handled all transactions, staking, reward distributions, and provided the technical foundation for token management, and Chow.  Meteora supposedly offered technical expertise, an easy user experience, and reliability.  Likewise, Chow leveraged his strong reputation in the Solana community, emphasizing his purported community orientation, good faith, and good intentions in connection with the entire M3M3 project.

81.     For example, on December 15, he described the purported early success of the M3M3 Platform and its demonstrated ability to create a "PPP" ("Player-Pump-Player") investing dynamic, asserting "M3M3 will spread the wealth and spread the love."  Further:  "If you want PVP, don't launch here":[6]



---

[6] https://x.com/hellochow/status/1868168423491993673

82.    Defendants' consolidated marketing campaign for $M3M3 and the M3M3 Platform, featured the promise of secure, consistent, and substantial passive returns for $M3M3 investors through the M3M3 Platform's innovative yield-generation mechanism, which they frequently described as a "Stake and Chill" model, suitable for inexperienced retail investors.

83.    Defendants repeatedly assured investors that $M3M3 was a fundamentally different—and materially better—product than typical memecoins based on its status as a Meteora product, the reliable revenues Meteora would supposedly generate for $M3M3 investors, and its highly publicized status as the "debut" product for an innovative investment platform designed to protect investors from excessive risk and malfeasance.

84.    Defendants executed the first $M3M3 "pump-and-dump" scheme within days of its December 4 launch, producing a sharp market price decline on December 6.

85.    Thereafter, they executed serial additional "pump-and-dumps," each likewise intended to artificially re-inflate $M3M3 market values and extract additional profits.

86.    As part of that strategy, Defendants persuaded third-party crypto exchanges to list $M3M3.  They also announced and promoted a series of strategic partnerships and collaborations with well-known cryptocurrency projects including, among others, Banx.gg (announced December 9), VECTOR (announced December 18) and GoatIndexAI (announced January 16).

87.    Defendants presented their collaboration with Banx.gg, a decentralized financial services provider, as an opportunity to leverage their $M3M3 Tokens, reinforcing Defendants' representation that $M3M3 Tokens were designed to be long-term, stable investments:[7]

---

[7] https://x.com/banx_gg/status/1866121079673983113



88.     Similarly, "M3M3's" collaboration with VECTOR, a trading analytics firm, would supposedly reward active $M3M3 traders, thereby increasing liquidity and generating higher transaction fee revenues for $M3M3 investors:[8]

---

[8] https://x.com/VECTORDOTFUN/status/1869457632022737341



89.     Indeed, on December 20, @hellochow purported to announce a new partnership between *Meteora* and "M3M3" pursuant to which Meteora would "adopt" $M3M3 as its "official memecoin" and the "M3M3 community" would enjoy new growths profits.[9]  His post implied— falsely—that there was an "M3M3" separate and apart from Defendants existing partnership.

## VII.     DEFENDANTS EXECUTE THEIR SCHEME, CAUSING TENS OF MILLIONS IN LOSSES TO NON-INSIDER INVESTORS IN $M3M3

90.     In or about November 2024, Kelsier offered a $2 million investment to partner with Meteora on $M3M3.  Chow accepted.  On information and belief, that investment was intended to fund—and did in fact fund—the artificial price inflation scheme Defendants jointly had concocted,

---

[9] https://x.com/hellochow/status/1870184607070474403

including, among other things, the initial launch pool liquidity provision (42 SOL), the Insider Wallet purchases executed during post-launch "freeze," and Defendants' coordinated marketing and promotions campaign for $M3M3 and the M3M3 Platform.

91.    As planned, the $M3M3 Token launch pool was created, launched, and secretly "frozen" on December 4, 2024.  Within 20 minutes, the Insider Wallets rapidly purchased 852.9 million $M3M3 Tokens from the "frozen" launch pool for a total of about $150,000 USD, inflating total market capitalization to about $5 million.

92.    Shortly thereafter, the launch pool was "unfrozen," and the Insider Wallets began systematically dumping $M3M3 Tokens in multiple small "sell" transactions, designed to disguise their behavior.  That coordinated selling activity caused a sudden, sharp drop in Token price that left non-insider investors with substantial losses.

93.    Non-insider investors did not know—and could not have known—about Defendants' subterfuge, insider trading, or post-launch control of the Token supply.  Defendants "froze" the $M3M3 launch pool surreptitiously.  Likewise, Defendants' "whitelisting" of the Insider Wallets—that is, the mechanism that permitted each Insider Wallet to coordinate with the deployer wallet to circumvent the "freeze" and purchase $M3M3 Tokens—was not publicly visible on the blockchain.  The initial concentration of $M3M3 Tokens in a relatively small number of wallets was publicly visible, but the identities of the people controlling those wallets was unknown, and the coordinated insider control of token supply was not known or discernible at the time.

94.    As a result of Defendants' deceptive tactics, $M3M3 Tokens price spiked by over 1,000,000% to above $0.12 within about a day.  On December 6, 2024, the Token's fully diluted market capitalization briefly exceeded $150 million.  Then it crashed.

95.    In addition, Defendants' deceptive tactics created the false appearance of

substantial investor demand for $M3M3 Tokens, despite minimal actual participation from arms-length investors.

96.    Investors reasonably relied on Defendants' representations that $M3M3 was launched publicly and fairly.  They thus also reasonably relied on the $M3M3 market price as a measure of the asset's value.

97.    Within hours, Defendants' initial scheme unraveled.  Between December 5 and 6, 2024, the Insider Wallets executed coordinated sales, dumping hundreds of thousands of dollars' worth of tokens onto the open market. One Insider Wallet liquidated approximately $222,000 within the first 40 minutes of public trading.  Others followed suit.  M3M3's price collapsed over 90%, falling from $0.15 to as low as $0.01–$0.02.

98.    In response to widespread investor outrage, Meteora issued public assurances between December 6 and 7, 2024, promising to "pay back stakers in full."  Meteora claimed that over $3 million in rewards had been allocated to stabilize Token price and reaffirmed the promise of $4.5 million in total rewards and $200,000 daily distributions.   These representations were intended to deter further panic selling and preserve the illusion of project viability.

99.    Between December 8 and 10, 2024, the token experienced a partial rebound, trading between $0.10 and $0.15 amid high volatility. Centralized exchanges XT.com and BingX listed $M3M3 during this period, driving renewed interest. Following the BingX listing on December 10, $M3M3 saw a 76% single-day price increase, closing around $0.12. However, liquidity remained limited at $2.2 million.

100.    On or about December 12, 2024, Meteora launched a trading competition promising $15,000 in token-based rewards to the top 25 traders by volume. The campaign temporarily increased trading activity, but sentiment among $M3M3 investors remained divided. Some

believed in the Token's purported long term yield; others suspected a classic pump-and-dump scheme.

101.    Between late December 2024 and early January 2025, the price of $M3M3 entered a prolonged decline.  By December's end, the price had fallen to between $0.02 and $0.03. Some early investors liquidated remaining holdings or exited after receiving staking rewards.

102.    On January 31, 2025, Meteora reported that approximately $800,000 in SOL rewards had been distributed to top stakers, in addition to restaked $M3M3 Tokens.  However, these rewards disproportionately benefited large holders and insiders who had staked early. As reward emissions slowed, sell pressure resumed and the token's value declined further.

103.    In early February 2025, $M3M3 experienced a short-lived price spike of approximately 85%, likely reflecting a "dead cat bounce." From a low near $0.003, the Token briefly rallied to around $0.006. However, no new developments or meaningful adoption materialized, and the price quickly collapsed again.

104.    By March 2025, $M3M3 had fallen to its all-time low of approximately $0.003. $M3M3 had lost over 98% of its peak value, with little remaining liquidity and minimal daily trading volume.  The vaunted M3M3 staking ecosystem had largely collapsed, and most investors were unable to recover even a fraction of their initial investments.

105.    $M3M3 remains near its all-time low, currently trading at approximately $0.003. Defendants have moved on to other projects, leaving $M3M3 holders with an unsupported and largely abandoned asset.

106.    $M3M3 thus proved to be a text example of insider-driven price manipulation followed by a systematic extraction of retail investor capital—a particularly culpable form of the very misconduct and risk that Defendants promised to protect investors against.

## VIII.  DEFENDANTS ARE PUBLICLY ACCUSED OF FRAUD

107.    After profiting from $M3M3, Defendants deliberately sought to obscure the origin and destination of their proceeds using methods designed to conceal blockchain transaction paths.

108.    They transferred funds through multiple cryptocurrency wallets, complicating the tracing process and intentionally obfuscating their coordinated insider activity.

109.    Defendants also used blockchain mixers—services specifically designed to anonymize transactions and disrupt transparent tracking of token proceeds—to hide the profits they extracted from $M3M3 investors.

110.    Since about mid-February, Defendants have been repeatedly publicly accused of misconduct in connection memecoin launches that, like $M3M3, proved to be an undisclosed collaboration between Meteora and Kelsier.

111.    In a series of February 17, 2025 posts on X, Moty Povolotski (@CavemanDhirk), the co-founder of DefiTuna (a Solana-based DeFi protocol), publicly severed ties with Kelsier, writing: "[u]pon finding out about Kelsier's activities we have refunded Kelsier and severed all ties."   He called attention to Meteora's long-standing partnership with Kelsier, writing: "It has been an internal secret that there is a massive spiderweb of influencers who are banking millions from the Meteora community enabled by the leadership team of Ben [Chow]."[10]

112.    Defendant Chow publicly stepped down as the CEO of Meteora that day.  He issued a public statement on X acknowledging his close collaboration with Kelsier and Defendant Hayden Davis in connection with $M3M3 (but falsely disclaimed wrongdoing).  He wrote in part:  "When

---

[10] https://x.com/CavemanDhirk/status/1891501745844502760

we launched our new memecoin AMM platform in December 2024 [i.e., the M3M3 Platform], I asked Hayden and Kelsier Ventures if they would be interested in launching a token on the M3M3 platform in order to provide an initial case study on how it worked.  And, while they deployed and launched [$]M3M3 on their own, post-launch we decided on a new set of tokenomics and facilitated a grant for the Meteora community as well as to establish a long-term foundation for M3M3."[11]   This assertion that $M3M3 had been deployed by Defendants Kelsier and Hayden Davis, "on their own"—untrue, as set forth herein—stood in stark contrast with Meteora and Chow's own prior implicit and explicit representations throughout the "M3M3" marketing campaign that the M3M3 Platform and $M3M3 were linked products offered, endorsed, and fully supported by Meteora.

113.    Meow, the Meteora co-founder, likewise publicly announced on February 17 that Meteora and Jupiter had launched an internal investigation, and that Meteora would be "looking for new leadership."[12]

## IX.    $M3M3 TOKENS ARE SECURITIES

114.    The Securities and Exchange Acts set a regime of full and fair disclosure. Those who offer and sell securities to the investing public must provide sufficient, accurate information to allow investors to make informed decisions before they invest.

115.    The definition of a "security" includes a wide range of investment vehicles, including "investment contracts." Investment contracts are instruments through which a person

---

[11] https://x.com/hellochow/status/1891341548115149190
[12] https://x.com/weremeow/status/1891664435321647186

invests money in a common enterprise and reasonably expects profits or returns on his investment derived from the entrepreneurial or managerial efforts of others. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946). Courts have found a wide range of novel or unique investment vehicles to constitute "investment contracts"—and thus securities—including interests in orange groves, animal breeding programs, railroads, and crypto assets.

116.    Throughout the relevant period, $M3M3 Tokens constituted an investment of money in a common enterprise with a reasonable expectation of profits derived from the efforts of others. They are thus securities subject to the requirements of the federal securities laws.

117.    *First,* Plaintiffs and other Class members invested "money"—principally SOL—in exchange for the $M3M3 Tokens they purchased.

118.    *Second*, Plaintiffs and other Class members participated in a common enterprise. Defendants marketed $M3M3 as a mechanism for investors to earn *pro rata* shares of pooled transaction fees generated by $M3M3 Token sales on Meteora. In addition, Plaintiffs and other and other Class members shared in the same profits and risks associated with the market price of $M3M3 Tokens, which were in turn tied with the performance of Meteora and the M3M3 Platform, and to the coordinated investor strategy (holding) promoted by Defendants and supposedly facilitated by the M3M3 Platform.

119.    *Third*, Plaintiffs and other Class members reasonably expected to profit from the entrepreneurial or managerial efforts of others, especially Defendants Meteora and Chow. Among other reasons, the value of $M3M3 was purportedly partially based on investors' ongoing future entitlement to a *pro rata* share of transaction fees generated on Meteora (and thus on its performance); on the salutary effects of the M3M3 Platform on $M3M3 price performance (and thus on the success of Meteora and Chow's purported memecoin investing innovation); and on the

purportedly proficient, reliable, and transparent launch conducted on Meteora by Defendants
Meteora and Chow.

## X.    CLASS ACTION ALLEGATIONS

120.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil
Procedure on behalf of a proposed class (the "Class") of all investors that purchased $M3M3
Tokens between December 4, 2024 and the date of this filing, April 19, 2025 (the proposed "Class
Period").  Excluded from the Class are Defendants and their agents, representatives, corporate
officers, board members, senior executives, immediate family members, heirs, successors, assigns,
and any entities in which any of the foregoing have or had a controlling interest.

121.    The proposed Class satisfies the requirements of Federal Rule of Civil Procedure
23 as follows:

### A.    Numerosity

122.    The members of the Class are so numerous that joinder of all members is
impracticable.  While the exact number of Class members is unknown and can only be ascertained
through appropriate discovery, on information and belief, there are many hundreds of non-insider
investors that purchased $M3M3 Tokens during the Class Period.

### B.    Typicality

123.    Plaintiffs are non-insider investors who purchased $M3M3 Tokens at artificially
inflated prices, in reasonable reliance on false and misleading information provided by Defendants
about the Tokens' material characteristics, including their price.

124.    Plaintiffs' claims are thus typical of the claims of all unnamed members of the
Class.

### C.    Adequacy

125.    The Plaintiffs will adequately protect the interests of all unnamed members of the

Class.  Their claims are typical of other Class members, with whom they have no known conflicts.

126.    Plaintiffs have retained competent counsel experienced in class action and securities litigation, including cryptocurrency securities litigation.

**D.    Prominence and Superiority**

127.    Questions of fact and law common to all members of the Class predominate in this action over any questions affecting only individual members.

128.    Questions of law and fact common to all members of the Class include:

a.    whether $M3M3 is a security;

b.    whether the federal securities laws apply to Defendants' offers and sales of $M3M3;

c.    whether Defendants misrepresented material information in connection with their offer and sales of $M3M3;

d.    whether Defendants did so intentionally, recklessly, and/or negligently;

e.    whether Defendants' execution of the $M3M3 Token launch constitutes fraud;

f.    whether Defendants committed "deceptive acts and practices" in violation of New York's General Business Law in connection with their offer, sale, and promotion of $M3M3;

g.    whether Defendants engaged in false advertising in violation of New York's General Business Law in connection with $M3M3;

h.    whether Defendants were unjustly enriched as a result of their offer and sale of $M3M3 Tokens;

i.    whether non-insider investors sustained damages as a result of Defendants' offer and sale of $M3M3 Tokens;

j.    whether Defendants are liable to non-insider investors for damages sustained in connection with their purchase of $M3M3 Tokens and, if so, the proper measure of damages;

k.    whether punitive damages are warranted.

129.    Members of the Class are readily identifiable by publicly accessible information.

The public nature of the transactions at issue in this action means it is relatively easy to communicate with $M3M3 investors and to ascertain the dates and amounts of their investments.

130.    Class treatment is superior to all other methods because it will permit a large number of similarly situated persons to prosecute their common claims in a single forum, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

131.    Class treatment will also permit adjudication of claims belonging to a large number of Class members who could not afford to litigate those claims on an individual basis.  In addition, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent adjudications establishing incompatible standards of conduct for Defendants.

132.    Plaintiffs are unaware of any difficulties likely to arise in the management of this action as a class action.

## XI.    CAUSES OF ACTION

### COUNT I
Unregistered Offer and Sale of Securities in Violation of
Sections 5 and 12(a)(1) of the Securities Act of 1933
(*Against all Defendants*)

133.    Plaintiffs incorporate all prior paragraphs by reference.

134.    15 U.S.C. § 77l(a)(1) (Section 12(a)(1) of the Securities Act) provides that "any person who . . . offers or sells a security in violation of section 77e of this title . . . shall be liable, subject to subsection (b), to the person purchasing such security from him."

135.    15 U.S.C. § 77e(a) (Section 5(a) of the Securities Act) states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or

otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

136.    15 U.S.C. § 77e(c) (Section 5(c) of the Securities Act) states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title."

137.    $M3M3 Tokens are investment contracts within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), and are therefore securities under that Act.

138.    Defendants offered, promoted, and sold $M3M3 Tokens: jointly developing and executing a plan to "launch" the $M3M3 Tokens on Meteora on December 4, 2024; purporting to make the Tokens publicly available at launch; actually making them publicly available after an initial, undisclosed limited-access period; coordinating with third-party crypto exchanges to make $M3M3 Tokens available on those exchanges as well; strategically "rewarding" $M3M3 Token holders and promoting those "rewards" to entice new investors; marketing and promoting the $M3M3 Tokens and Defendants' related services, the M3M3 Platform and Meteora DEX, throughout the Class Period; and funding those efforts.

139.    No registration statement for $M3M3 Tokens has ever been filed with the SEC, and no registration statement has ever been in effect with respect to the offering of $M3M3 Tokens.

140.    As a direct and proximate result of Defendants' offer and sale of unregistered

securities, Plaintiffs and other members of the Class have suffered damages.

141.    As a result of their conduct, Defendants are liable to Plaintiffs and other Class members for damages or recission, as well as costs, attorneys' fees, and interest.

**COUNT II**
Fraud in Connection with the Purchase or Sale of Securities in Violation of
Section 10(b) of the Exchange Act of 1934 and Rule 10b-5 thereunder
(*Against all Defendants*)

142.    Plaintiffs incorporate all prior paragraphs by reference.

143.    Section 10(b) and Rule 10b-5(b) make it illegal, in connection with the purchase or sale of a security, "for any person directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . to employ any device, scheme, or artifice to defraud" or to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

144.    Defendants used the means and instrumentalities of interstate commerce to perpetrate a fraud on Plaintiffs and other Class members in connection with the sale of $M3M3 Tokens.  Specifically, Defendants deliberately artificially inflated the price of $M3M3 Tokens by facilitating a clandestine, coordinated post-launch period of time during which purchase transactions could only be successfully executed by Defendants and a closely organized group of their affiliates using the Insider Wallets.  Defendants then sold those Tokens to Plaintiffs and other Class members at the artificial prices they had intentionally manufactured, causing a precipitous price correction.

145.    In addition, Defendants used the means and instrumentalities of interstate commerce to misrepresent material facts about $M3M3 Tokens, the mechanics of the $M3M3 Token launch, the existence of substantial, coordinated illicit insider trading immediately upon the

Token's purportedly "public" launch, the reliability of $M3M3 Token price information, and the risk profile of $M3M3 Tokens relative to other digital asset investments.

146.    Defendants engaged in these fraudulent activities knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and other members of the Class.

147.    Plaintiffs and other Class members were ignorant of Defendants' fraudulent scheme and of the false and misleading nature of their material misrepresentations and omissions.  They thus reasonably relied on the integrity of market price information, and on Defendants' representations that the $M3M3 Token launch was conducted in a fair and publicly accessible manner, to purchase $M3M3 Tokens at significantly inflated prices.  But for the fraud perpetrated by Defendants, they would not have purchased $M3M3 Tokens at artificially inflated prices.

148.    As a direct and proximate result of Defendants' misconduct, Plaintiffs and other members of the Class suffered damages, and Defendants are liable for damages or recission, as well as costs, attorneys' fees, and interest.

### COUNT III
Control Person Liability under Section 15 of the Securities Act of 1933
(*Against the Individual Defendants*)

149.    Plaintiffs incorporate all prior paragraphs by reference.

150.    Throughout the relevant period, Defendant Chow acted as a controlling person of Defendant Meteora within the meaning of Section 15 of the Exchange Act.  Because of his executive position and his control over the day-to-day operations of Meteora, Defendant Chow had the ability and power to control—and did in fact control—Defendant Meteora and its agents, including with respect the offer and sale of $M3M3 Tokens.

151.    Likewise, throughout the relevant period, Defendants Hayden Davis, Gideon Davis

and Charles Thomas Davis acted as controlling persons of Defendant Kelsier within the meaning of Section 15 of the Exchange Act.  By reason of their respective executive positions in Kelsier and their joint control over its day-to-day operations, the Davis Defendants had the ability and power to control—and did in fact control—Defendant Kelsier and its agents, including with respect the offer and sale of $M3M3 Tokens.

152.    Accordingly, the Individual Defendants are liable to Plaintiffs and the other Class members pursuant to Section 15 of the Securities Act.

**COUNT IV**
Control Person Liability Under Section 20 of the Exchange Act of 1934
(*Against the Individual Defendants*)

153.    Plaintiffs incorporate all prior paragraphs by reference.

154.    Throughout the relevant period, Defendant Chow acted as a controlling person of Defendant Meteora within the meaning of Section 20(a) of the Exchange Act.  By reason of his executive position and his control over the day-to-day operations of Meteora, Defendant Chow had the ability and power to control—and did in fact control—Defendant Meteora and its agents, including with respect to the content and dissemination of the materially misleading statements, information, and omissions alleged herein.

155.    Likewise, throughout the relevant period, Defendants Hayden Davis, Gideon Davis and Charles Thomas Davis acted as controlling persons of Defendant Kelsier within the meaning of Section 20(a) of the Exchange Act.  By reason of their respective executive positions in Kelsier and their joint control over its day-to-day operations, the Davis Defendants had the ability and power to control—and did in fact control—Defendant Kelsier and its agents, including with respect to the content and dissemination of the materially misleading statements, information, and omissions alleged herein.

156.     Accordingly, the Individual Defendants are liable to Plaintiffs and the other Class members pursuant to Section 20(a) of the Exchange Act.

**COUNT V**
Violation of New York General Business Law §§ 349 and 350
(*Against all Defendants*)

157.     Plaintiffs incorporate all prior paragraphs by reference.

158.     New York General Business Law ("<u>GBL</u>") § 349 prohibits "deceptive acts and practices in the conduct of any business, trade, or commerce or in the furnishing of any service" in New York State.

159.     GBL § 350 similarly prohibits "false advertising in the conduct of any business, trade or commerce or in the furnishing of any service" in New York State.

160.     Defendants engaged in "deceptive acts and practices" and in "false advertising" in New York in their joint promotion, offering, and sale of $M3M3.  This conduct was aimed at the general public.

161.     For example, Defendants publicly represented that $M3M3 offered retail investors consistent, passive income generated on Meteora through "Stake and Chill," the innovative staking mechanism at the heart of the M3M3 Platform.  They also represented—on statements prominently displayed on Meteora's website and on social media—that the amount of passive income available to $M3M3 investors was substantial, *e.g.*, "Over $4.5 million in rewards already accumulated," "$200,000 or more daily being paid out to top stakers."

162.     Defendants also publicly represented that the $M3M3 Token launch was public and fairly conducted, which—if true—would mean that its market price was correlated to its value, as Defendants likewise strenuously publicly asserted.

163.     Defendants also leveraged the reputation and standing of Defendants Meteora and

Chow to further promote and falsely legitimize $M3M3. They also expressly encouraged investors to expect stable financial returns from $M3M3 based on its deep ties to Meteora and on Chow and Meteora's asserted deep good-faith commitment to and support for $M3M3 investors.

164.    Defendants' representations were materially misleading because the $M3M3 launch was neither public nor fairly conducted and because $M3M3 market price was secretly intentionally manipulated by Defendants, as alleged herein.  Instead of good-faith commitment to investor protection, Defendants intended to systematically extract value from retail investors by inducing them to buy $M3M3 at artificially inflated prices.

165.    Retail purchasers reasonably relied upon Defendants' deceptive marketing claims, including their misrepresentations about the economic value of $M3M3 and the reliability of its market price.  They did not know and could not have known about the coordinated insider trader and price manipulation schemes alleged herein.

166.    Retail purchasers were thereby induced to $M3M3 Tokens at artificially inflated prices, resulting in significant financial losses.

167.    Defendants' acts and practices were materially deceptive, unfair, and misleading in violation of GBL § 349.

168.    Likewise, the promotional statements, information, and materials Defendants disseminated to potential investors were materially misleading in violation of GBL § 350.

169.    Defendants' acts were willful, intentional, and egregious, justifying punitive damages to deter similar future conduct, and any available equitable relief, including disgorgement of profits obtained by Defendants through their deceptive and fraudulent business practices.

170.    As a direct and proximate result of Defendants' violations of GBL §§ 349 and 350, Plaintiffs and the proposed Class suffered substantial monetary damages. They are entitled to

recover compensatory and punitive damages in amounts to be determined at trial, along with interest, attorneys' fees, and litigation costs, and such other relief as may be available.

## COUNT VI
Fraud
(*Against All Defendants*)

171.    Plaintiffs incorporate all prior paragraphs by reference.

172.    As set forth herein, Defendants made material false representations of fact about the $M3M3 Tokens and the $M3M3 Token launch to Plaintiffs, other members of the proposed Class, and to the investing public generally.

173.    Defendants knew that those material representations were false when made.

174.    Defendants intended for Plaintiffs and other investors to rely on their false representations, and they intended to defraud them thereby.

175.    Plaintiffs and other members of the Class reasonably relied on Defendants' false representations to purchase the $M3M3 Tokens at artificially inflated prices.

176.    As a direct result, Plaintiffs and other members of the Class suffered damages.

177.    Defendants' misconduct involved high moral turpitude and was aimed at the public generally.

178.    Plaintiffs and other Class members are entitled to damages and punitive damages in amounts to be determined at trial, along with interest, attorneys' fees, and litigation costs, and such other relief as may be available.

## COUNT VII
Negligent Misrepresentation
(*In the alternative to Count VI, against all Defendants*)

179.    Plaintiffs incorporate all prior paragraphs by reference.

180.    Defendants publicly and intentionally represented Defendants Meteora and Chow as possessing expertise in and specialized knowledge about digital assets, token launches, Meteora,

memecoin investing, the M3M3 Platform, and the $M3M3 Token.  By so doing, Defendants incurred a corresponding common law duty to impart accurate information about the $M3M3 Token and the $M3M3 Token launch on Meteora to Plaintiffs, other Class members, and all other non-insider potential investors in $M3M3.

181.    Defendants violated that duty by providing false information about material aspects of $M3M3, upon which Plaintiffs and other members of the proposed Class reasonably relied to purchase $M3M3 at artificially inflated prices.  As a direct result, Plaintiffs and other members of the Class suffered damages.

182.    Defendants failed to exercise reasonable care in the course of providing and communicating false information about material aspects of $M3M3 to Plaintiff and the proposed Class.

183.    Plaintiffs and other members of the Class are entitled to damages in an amount to be determined at trial, along with interest, attorneys' fees, and litigation costs and such other relief as may be available.

### COUNT VIII
Unjust Enrichment
(*Against All Defendants*)

184.    Plaintiffs incorporate all prior paragraphs by reference.

185.    As a result of Defendants' misconduct alleged herein, Defendants were wrongfully enriched at the expense of Plaintiffs and other Class members, whom they exposed to multiple violations of law and significant financial losses.

186.    Defendants directly profited from the misconduct alleged herein, as it enabled them to sell the $M3M3 Tokens illicitly acquired by the Insider Wallets at artificially inflated market prices, causing significant losses to Plaintiffs and other members of the Class.

187.    Defendants' profits from these deceptive practices were achieved at the direct expense of Plaintiffs and the proposed Class, who provided valuable cryptocurrency assets (primarily SOL tokens) based on false price information and materially misleading representations regarding token stability, liquidity, profitability, and market valuation.

188.    It would violate principles of equity and good conscience for Defendants to keep the profits they gained from their misconduct.  Accordingly, Defendants must disgorge those profits to Plaintiffs and other Class members.

189.    Plaintiffs and other Class members are entitled to restitution of the full amount wrongfully obtained by Defendants, along with interest, attorneys' fees, litigation costs, and such other equitable relief as the Court may deem just and proper.

## XII.   PRAYER FOR RELIEF

WHEREFORE, on behalf of themselves and the Class, Plaintiffs respectfully request judgment as follows:

A.    Determining that this action is a proper class action and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' undersigned counsel as Class counsel;

B.    Awarding Plaintiffs and the Class damages or rescissory damages and interest;

C.    Awarding Plaintiffs and the Class exemplary or punitive damages;

D.    Awarding Plaintiffs and the Class reasonable costs and attorneys' fees;

E.    Appointing a receiver to take possession, custody, and control of the assets, property, and business operations of Meteora, pursuant to Federal Rule of Civil Procedure 66;

      F.     Awarding such equitable, injunctive or other relief as the Court may deem

just and proper.

**XIII.  JURY DEMAND**

Plaintiffs respectfully request a trial by jury.

Dated:  April 19, 2025                   Respectfully submitted,
      New York, NY

                                   **HOPPIN GRINSELL LLP**

                                   By: *Margaret B. Hoppin*
                                   Margaret B. Hoppin
                                   margot@hoppingrinsell.com
                                   Timothy W. Grinsell
                                   tim@hoppingrinsell.com
                                   11 Hanover Square, Ste. 1405
                                   New York, NY 10005

                                   **BURWICK LAW, PLLC**
                                   Max Burwick (*admission pending*)
                                   maxb@burwick.law
                                   43 West 43rd Street, Ste. 114
                                   New York, NY 10036